**EXHIBIT "A"**



CORPORATION SERVICE COMPANY

# Notice of Service of Process

NTP / ALL
Transmittal Number: 9711130
Date Processed: 03/16/2012

| | |
|---|---|
| Primary Contact: | Catherine Duffy<br>Golden State Foods<br>18301 Von Karman Avenue<br>Suite 1100<br>Irvine, CA 92612 |
| Copy of transmittal only provided to: | Shirley Schaal<br>Lupe Solis<br>Ramina Yadegarians |

| | |
|---|---|
| Entity: | Golden State Foods Corp.<br>Entity ID Number 2980017 |
| Entity Served: | Golden State Foods Corp |
| Title of Action: | William H. Bailey vs. Golden State Foods Corp. |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Other |
| Court/Agency: | Rockdale County Superior Court, Georgia |
| Case/Reference No: | 2012-CV-1346I |
| Jurisdiction Served: | Georgia |
| Date Served on CSC: | 03/16/2012 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Drew Mosley<br>678-225-0098 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

IN THE SUPERIOR COURT OF ROCKDALE COUNTY
STATE OF GEORGIA

FILED IN OFFICE
CLERK SUPERIOR COURT
ROCKDALE CO., GA

2012 MAR 12  PM 3: 56

*Ruth A. Wilson* CLERK

WILLIAM H. BAILEY,
        PETITIONER,

VS.

GOLDEN STATE FOODS CORP.,
        RESPONDENT.

}
}
}
}
}
}
}
}

CIVIL ACTION FILE NO.

2012-CV- 1346 I

## SUMMONS

TO THE ABOVE NAMED RESPONDENT:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is;

        Drew Mosley
        Drew Mosley LLC
        600 S. Perry Street
        Lawrenceville, GA 30046

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _12_ day of _March_ 2012.

_Hilary Malory_
By Deputy Clerk

# General Civil Case Filing Information Form (Non-Domestic)

FILED IN OFFICE
CLERK SUPERIOR COURT
ROCKDALE CO., GA.

**Court**
☑ Superior
☐ State

**County** Rockdale

**Docket #** _____

**Date Filed** 03/12/2012
MM-DD-YYYY

2012 MAR 12  PM 3: 56

*Ruth A. Wilson* CLERK

**Plaintiff(s)**
BAILEY    WILLIAM H.
Last      First      Middle I. Suffix Prefix      Maiden

Last      First      Middle I. Suffix Prefix      Maiden

Last      First      Middle I. Suffix Prefix      Maiden

Last      First      Middle I. Suffix Prefix      Maiden

**No. of Plaintiffs** 1 _____

**Defendant(s)**
GOLDEN STATE FOODS CORPORATION
Last      First      Middle I. Suffix Prefix      Maiden

Last      First      Middle I. Suffix Prefix      Maiden

Last      First      Middle I. Suffix Prefix      Maiden

Last      First      Middle I. Suffix Prefix      Maiden

**No. of Defendants** 1 _____

**Plaintiff/Petitioner's Attorney**      ☐ Pro Se

Mosley          Drew
Last            First            Middle I.    Suffix

**Bar #** 526406 _____

### Check Primary Type (Check only ONE)

☐ Contract/Account

☐ Wills/Estate

☐ Real Property

☐ Dispossessory/Distress

☐ Personal Property

☐ Equity

☐ Habeas Corpus

☑ Appeals, Reviews

☐ Post Judgment Garnishment, Attachment, or Other Relief

☐ Non-Domestic Contempt

☐ Tort (If tort, fill in right column)

☐ Other General Civil Specify _____

### If Tort is Case Type:
### (Check no more than TWO)

☐ Auto Accident

☐ Premises Liability

☐ Medical Malpractice

☐ Other Professional Negligence

☐ Product Liability

☐ Other Specify _____

**Are Punitive Damages Pleaded?** ☐ Yes  ☐ No

IN THE SUPERIOR COURT OF ROCKDALE COUNTY
STATE OF GEORGIA

FILED IN OFFICE
CLERK SUPERIOR COURT
ROCKDALE CO., GA

2012 MAR 12  PM 3: 56

*Ruth A. Wilson* CLERK

| | |
|---|---|
| WILLIAM H. BAILEY,<br>   PETITIONER, | )<br>)<br>) |
| | ) |
| VS. | ) |
| | ) |
| GOLDEN STATE FOODS CORP.,<br>   RESPONDENT. | )<br>)<br>) |

CIVIL ACTION FILE NO.

2012 ev - 1346 I

## PETITION TO VACATE ARBITRATION AWARD

COMES NOW, Petitioner William H. Bailey, by and through his undersigned counsel, and moves the Court to vacate the arbitration award of December 13, 2011 between Bakery, Confectionary, Tobacco Workers and Grain Millers International Union, Local 42, Union, and Golden State Foods, Company, pursuant to O.C.G.A. § 9-9-13, and to grant a new arbitration with a different arbitrator on the following grounds:

1.

Respondent has a place of business in Rockdale County, to wit its facility in Conyers, Georgia at 1525 Old Covington Rd., NE, Conyers, GA 30013, is subject to the jurisdiction of this Court, and venue is proper.  Respondent may be served through its registered agent at Corporation Service Company, 40 Technology Parkway South, Suite #300, Norcross, GA 30092 (Gwinnett County).

2.

There took place an arbitration between the parties on September 16, 2011. Petitioner participated in the arbitration.

3.

Petitioner's rights were prejudiced by corruption, fraud, or misconduct in procuring the award. Central to the termination of Petitioner was a claim by Michael Moravek of a purported death threat by Petitioner. Distortion of Petitioner's actual statement and meaning was misconduct by Moravek and worked corruption and fraud in the procurement of the award.

4.

Petitioner's rights were prejudiced by partiality of the arbitrator appointed as a neutral. *Inter alia*, the arbitrator construed an allegation about a hypothetical situation in which someone was to "get wet" as a death threat. Partiality is apparent throughout the transcript of the proceedings.

5.

Petitioner's rights were prejudiced by an overstepping by the arbitrator of her authority and such imperfect execution of it that a final and definite award upon the subject matter submitted was not made. As quoted on page fourteen (14) of the Arbitration Award: "Here, fellow employees Moravek and Howard, as well as company management, addressed the Grievant's intangibles as suggesting that he posed a serious threat. On these facts, the undersigned will not substitute her judgment for that of those who are in a better position to make that assessment." Therefore, the arbitrator did not even make her own findings of fact on these points. Intangibles seems to be allowing for non-factual judgments made by witnesses. Ordinarily, a judge of law and fact, as the arbitrator here, is to avoid and not give credence to inarticulable prejudice and bias.

6.

Petitioner's rights were prejudiced by the arbitrator's manifest disregard of the law. "Just cause" is required for discipline and discharge under the relevant contract. The arbitrator disregarded the lack thereof as well as the denial of Petitioner's due process rights with regard to the investigation and determination of the matter by the company.

Respectfully submitted this 12th day of March, 2012.

Drew Mosley, Attorney for Petitioner
GA Bar No. 526406
Drew Mosley LLC
600 South Perry Street
Lawrenceville, GA 30046
678-225-0098 phone
678-221-0230 fax
drew@mlawmail.com

IN THE MATTER OF ARBITRATION BETWEEN

| | | |
|---|---|---|
| BAKERY, CONFECTIONARY, TOBACCO WORKERS AND GRAIN MILLERS INTERNATIONAL UNION, LOCAL 42 | : : : : | FMCS No. 110701-57038-3 |
| Union | : | |
| | : | Discharge of Bill Bailey |
| and | : | |
| GOLDEN STATE FOODS | : : | |
| Company | : : | |

Before:          Kathryn Durham, JDPC, ARBITRATOR

Appearances:

|  |  |
|---|---|
| For the Union: | James D. Fagan<br>Stanford Fagan, LLC |
| For the Company: | Rodney G. Moore<br>Baker Donelson Bearman Caldwell & Berkowitz, PC |

|  |  |
|---|---|
| Date of Hearing: | September 16, 2011 |
| Briefs Submitted: | October 28, 2011 |
| Date of Decision: | December 13, 2011 |
| Location of Hearing: | Atlanta, GA |

AWARD SUMMARY

The grievance is denied. The Company had just cause to discharge the Grievant, Bill Bailey.

*Kathryn Durham*

Kathryn Durham, JDPC

## I.  ISSUE

The parties stipulated that the issue to be decided is:

> Did the Company have just cause to discharge the Grievant, Bill Baily, and if not what shall be the appropriate remedy?

## II.  RELEVANT CONTRACT PROVISIONS

### Article 20 – Work Rules and Regulations

A.   It is agreed that the Company has the right to promulgate and establish, during the life of this Agreement, reasonable work rules for operating this plant and governing the conduct of employees while on Company premises. In order to avoid possible misunderstandings, the Company agrees that the said work rules shall be posted and that all employees shall be given a copy of said work rules as they are promulgated.

B.   Issuance of four (4) written disciplinary notices, whether they be letters or layoff notices, or a combination thereof, to any one employee within a six (6) month period is just cause for discharge.

C.   Any written disciplinary notice shall be of no force or effect after six (6) months from their date of issuance. Any absences over two (2) consecutive weeks will extend the time limit during which the disciplinary notice will be in force and effect.

D.   The Company agrees to inform the Chief Shop Steward of any future plant rules and regulations prior to posting and implementation.

E.   Disciplinary actions under these work rules are subject to the grievance procedure.

F.   The employee's discharge date shall be the same date as the fourth (4th) disciplinary notice.

### Article 21 – Discharge and Suspension

Employees shall be disciplined and/or discharged only for just cause. It is understood and agreed that the degree of discipline up to and including discharge imposed for just cause shall be in the

2

sole discretion of management within the scope of this Article.

In the event an employee feels that he/she was unjustly discharged or laid off, he/she shall pursue the matter according to the grievance procedure established in this Contract.

In the event of discharge of an employee, the individual shall leave the premises of the employer immediately; if the employee feels he/she has been treated unfairly, he/she can notify the Chief Shop Steward or Shop Steward if the Chief Shop Steward is absent before leaving the premises. The employee shall not be allowed to return to the plant earlier than the next work shift and, if the employee desires to return to the plant, he/she shall be accompanied by the Chief Shop Steward or the Shop Steward if the Chief Shop Steward is not available.

If it is decided that an injustice has been dealt the discharged or laid off employee, the Company will reinstate the laid off or discharged employee and pay him/her for any scheduled work shift loss at his/her regular rate of pay. If an employee is discharged, he/she will be paid his/her full earnings at the time of discharge upon request.

In the event of discharge or suspension, the Company hereby agrees to give the Union written notice by certified mail by mailing same within two (2) working days following the actual discharge or suspension. A copy of the discharge notice shall be mailed to the employee at his home address as contained in the employee's personnel file.

## III. FACTS

Background

The Union and the Company are parties to a Contract dated February 29, 2008 (the "CBA"). The Grievant was a member of the bargaining unit covered by the CBA.

The Company, Golden State Foods, is a food processor and distributor that primarily manufactures sauces and condiments for distribution to fast-food chain restaurants. It operates a manufacturing facility in Conyers, GA.

The Grievant, Bill Baily, worked for the Company as a Maintenance Technician from January 2005 until his discharge on June 16, 2011.

3

Pursuant to Article 20, Section A, of the CBA, the Company has the right to establish and enforce "reasonable work rules for operating this plant and governing the conduct of employees while on Company premises." The Company's Work Rules and Regulations categorizes its work rules in two ways. "Group One" work rules are "very serious and may call for immediate discharge or suspension," depending on the severity of the violative conduct. "Group Two" work rules "are less serious in nature and call for progressive discipline." Group Two violations result in either verbal or written warnings. Pursuant to CBA Article 21, an employee who accumulates four written warnings in a six month period can be discharged for just cause.

The Company's Group One Work Rules prohibit, among other things, "[a]ny behavior or actions which violates the Company's established Harassment Free Workplace Policy." The Company's Harassment and Discrimination Free Workplace Policy is part of its Behavior and Conduct Policies, which also includes a Violence in the Workplace Prevention Policy (hereafter, the "Workplace Violence Policy"), which states in relevant part:

> Senior management is firmly committed to the establishment and administration of a policy that provides "zero tolerance" for actual or threatened violence in the workplace.

> All Company employees, including managers, supervisors, and non-supervisory employees, are strictly prohibited from threatening or committing any act of violence against co-workers, visitors, or any business invitee while on duty, while on Company-related business or activity, or while operating any Company vehicle or equipement, or while having contact with the person during the course of his or her employment.

> ••••

> Due to the importance of this non-violence policy, compliance with the policy is a condition of employment and violation of the policy may be subject to disciplinary action,  up to and including immediate termination of employment.

The Workplace Violence Policy provides examples of conduct that constitutes "Threats of Violence," including:

- Making a verbal threat to harm another individual or to destroy property.
- Making menacing gestures. Expressing significant grudges against co-workers.
- Attempting to intimidate or harass other individuals.

It is undisputed that the Grievant was aware of the Company's Work Rules, Behavior and Conduct Policies, and of the Workplace Violence Policy. Although Mr. Bailey had received a number of verbal and written warnings for violations of the Workplace Rules, none of those warnings was active at the time of the incidents underlying his discharge.

January 2011 Incident

In January 2011, the Grievant had an altercation with Plant Manager Brian Dick. According to Mr. Bailey, Mr. Dick was very angry and accused the Grievant of threatening someone, although he would not disclose who had allegedly been threatened. The Grievant testified that Mr. Dick ordered him to clock out and go home before the end of his shift, under threat of being fired if he did not comply.

This altercation closely followed a meeting that the Grievant had had with management and the Union about several grievances he had filed regarding holiday pay. Mr. Bailey acknowledges that, at the end of this meeting, he advised the Company and Union representatives that, if they could not address his concerns, he would pursue the matter to "a judge." Mr. Bailey was never issued any discipline related to this accusation of making a threat. Nor did he ever pursue the grievances further.

June 6 and 7, 2011 Incidents

On June 6, 2011, Liquids Engineer Skip Munn (who is the Grievant's manager) called the Grievant and two other maintenance workers into a meeting, and informally reprimanded them for taking breaks on the shop floor the previous day. According to Mr. Bailey's testimony, before that meeting it was common practice for Maintenance Technicians to remain in the work area while they were taking breaks or awaiting calls for their next assignments. The Grievant interpreted Mr. Munn's admonishment as being singled out for discipline.

The same day, June 6, 2011, the Grievant went to the parts room ("MRO") and spent a significant amount of time (over 40 minutes) in the MRO, apparently (as was caught on videotape) socializing with other employees. The next day, June 7, 2011, the Grievant was again approached by Skip Munn, and was admonished that he was not to linger in the MRO if he needed to get parts, but was to obtain parts and get back to work quickly.

The Grievant interpreted this second admonition as harassment. According to Mr. Bailey, there were other maintenance employees in the MRO during the same time period on June 6, 2011, and those employees were not pulled aside and given informal warnings. The Grievant commented to Mr. Munn that, in the future he would just send in an order for parts and the MRO could send parts to him. Munn inquired whether Mr. Bailey was suggesting refusal to do his job (which included going to the MRO for parts) and the Grievant denied it.

Out of frustration, the Grievant acknowledges that he ended his encounter with Skip Munn by making a comment to the effect of "Tomorrow are you going to tell me when I

5

can take a shit?" Mr. Munn testified that he was not shocked or appalled or otherwise concerned about the remark at the time. Mr. Bailey left the meeting and returned to work.

Later that night, the Grievant encountered Parts Clerk Michael Moravek at about 7:15 p.m. outside between the MRO and the smoking area. They stopped and had a conversation for over half an hour. According to the signed statement Mr. Moravek provided later, during that conversation the Grievant referred to Plant Manager Brian Dick as a "bi-polar asshole" and stated that, if he (Mr. Bailey) were to go on [an upcoming Company-sponsored fishing trip] "I would request to be in Skip [Munn's] boat and he wouldn't come back."

The Grievant disputes that he commented that Mr. Munn "wouldn't come back." Instead, he contends that his comment was that if he and Mr. Munn were in the same boat, Mr. Munn "would get wet." It is clear from the evidence that the Grievant prefaced or accompanied this comment about the fishing trip with a disclaimer that he did not intend to go on the fishing trip.

Following this discussion, Michael Moravek attempted to contact Skip Munn, concerned that the Grievant had made a threat of violence against him. Mr. Munn did not connect with Mr. Moravek until after the events of June 8, 2011.

<u>June 8, 2011 Disciplinary Meeting</u>

After his meeting with the Grievant on June 7, Skip Munn spoke with Kim Donahue, the Human Resources Manager at the Conyers plant, about issuing a written warning to Mr. Bailey. They agreed that the Grievant should be given a written warning for violation of Group Two Rule 7 – failure to perform job in accordance with Company standards or in accordance with verbal or written instructions. Mr. Munn drafted the written warning, describing the violative conduct as "Associate was in MRO past a reasonable amount of time when approached about the issue was blatantly disrespectful to the department manager."

Mr. Munn then called a meeting with the Grievant to administer the written warning. The meeting was held on June 8, 2011. Mr. Munn attended, along with Maintenance Supervisor David Walker. The Grievant was represented by Union Steward Jerome Howard. Mr. Howard had never represented Mr. Bailey in disciplinary proceedings, and the two did not know each other well, if at all.

During the meeting, the Grievant was combative. Although he admitted being in the MRO for a long time, and acknowledged making the comment to Mr. Munn about telling him "when to take a shit," Mr. Bailey was adamant that that conduct was not inappropriate. He turned to Mr. Howard and asked whether he thought the comment was inappropriate. Mr. Howard said that he did think it was inappropriate. This response surprised and angered the Grievant.

Mr. Bailey accused Mr. Howard of not representing him, but rather being on the Company's side. When Skip Munn attempted to end the meeting by having the Grievant sign acknowledgement of the warning, Mr. Bailey refused to sign. Mr. Howard said that he would sign on the Grievant's behalf, and the Grievant blew up at him, forbidding him to sign the notice. Although Mr. Howard testified that he did not feel intimidated by the Grievant, both he and Skip Munn testified that the Grievant's body language and tone of voice appeared to be an attempt to intimidate the steward.

After the disciplinary meeting, the Grievant and Jerome Howard stood outside the meeting room and had a conversation for a few minutes, possibly as long as 15-20 minutes. During this conversation, Mr. Bailey was not threatening or intimidating, but Mr. Howard testified that he was very angry, very agitated, and that he was not making sense.

Decision to Suspend and Discharge

After the meeting on June 8, Skip Munn and Kim Donahue decided to suspend the Grievant pending further investigation, based on his conduct – namely, his perceived attempt to intimidate Jerome Howard – during the meeting. Munn and Donahue met with the Grievant when he arrived for work on June 9, 2011 to advise him of the suspension.

After Ms. Donahue told him that he was being suspended for a Group One Work Rule violation, Mr. Bailey demanded to know additional information about why he was being suspended. Management did not provide any further information at that time.

After that meeting, Mr. Munn and another employee, Hector Carrasquillo, walked the Grievant out of the facility. It is the Company's normal policy to escort employees out of the plant when they are suspended, but it was Mr. Munn's decision to have another employee accompany him, based on his concerns about what he perceived as Mr. Bailey's threatening behavior the day before. When they reached the facility gate, the Grievant turned to Mr. Munn and told him to "have fun at your fishing trip tomorrow."

At the time, the Grievant's comment did not mean anything to Mr. Munn. Later that day, however, he spoke to Michael Moravek and learned about the comments the Grievant had allegedly made the previous evening about him not coming back from the fishing trip. Mr. Moravek told Mr. Munn that the Grievant was agitated and threatening when he made the comments, and that he (Mr. Moravek) had real concerns that the Grievant might do something violent, despite the fact that Mr. Bailey had also told him he did not intend to go on the fishing trip.

Mr. Munn interpreted the Grievant's comment to Michael Moravek about the fishing trip to be a death threat. HR Manager Kim Donahue conducted an investigation into the Grievant's comments to Mr. Moravek and into his conduct during the June 8 meeting. She interviewed and obtained written statements from Jerome Howard, Skip Munn, Michael Moravek and David Walker. She did not interview the Grievant.

7

Based on her investigation, Ms. Donahue determined that the Grievant had violated the Company's Violence Policy, which is a Group One Rule 17 violation and warrants immediate termination according to the Company's "zero tolerance" policy. She, along with Mr. Munn, Plant Manager Brian Dick and the Company's Senior Vice President of HR, Steve Becker, made the decision to terminate the Grievant based on his conduct during the June 8, 2011 meeting and the alleged "death threat" conveyed to Mr. Moravek, in violation of Group One Rule 17.

The Grievant was terminated on June 16, 2011. Ms. Donahue notified Chief Union Steward Martha Woodard of the termination. The Union filed a grievance, and management then met with the Union to discuss the grievance. The Company objected to allowing Mr. Bailey to attend the meeting on Company premises, but offered to make alternative arrangements to participate. The Grievant did not participate in that meeting, nor did he attend in any other grievance proceedings before arbitration, or a hearing before the Georgia Department of Labor (apparently concerning unemployment benefits).

## IV. POSITIONS OF THE PARTIES

Company Position

The Company has the burden of proof in this matter. First, it argues that there was just cause to discharge the Grievant based on his threatening and intimidating conduct during the June 8, 2008 disciplinary meeting, and based on what it characterizes as the death threat Mr. Bailey conveyed to Mr. Moravek regarding Skip Munn.

The Company stresses that it has a "zero tolerance" policy towards workplace violence. Its violence policy defines workplace violence to include making threats of harm, menacing gestures, and attempts to intimidate co-workers. The Grievant committed all of these acts, the Company maintains: he made a death threat against Skip Munn, and he exhibited menacing and intimidating body language towards Jerome Howard.

The Company cites numerous instances of workplace violence that have made national news, as well as statistics from the Department of Labor regarding fatalities in the workplace, to support its position that it must have absolute authority to discharge employees who demonstrate an inclination to commit violence against their co-workers. It also cites a number of prior arbitration awards upholding an employer's decision to discharge employees who have made threats or exhibited menacing behavior.

Specifically, the Company relies on the award of Arbitrator Nicholas Duda, Jr. in Modine Mfg. Co. v. Sheet Metal Workers Int'l Assn. Local 55, 121 Lab. Arb. (BNA)(2005), which held that once the employer showed that the grievant made a threat of harm, the burden of proof shifted to the grievant to prove that the threat was not seriously made. Here, the Company argues, the Company established that a threat was made, but Mr. Bailey

8

failed to establish that the threat was not serious. The Company points to the comment the Grievant made to Skip Munn as he was escorted out of the plant on June 9, 20011 — to "have fun on the fishing trip" — as evidence that the death threat spoken to Mr. Moravek was serious, and that the Grievant wanted Mr. Munn to be intimidated.

Second, the Company disputes the Union's contention that Ms. Donahue's pre-termination investigation was flawed because she did not interview the Grievant as part of her investigation. It cites a number of arbitral awards holding that it is not necessary for an employer to interview the grievant prior to issuing discipline, so long as there was just cause for the discipline, and particularly where interviewing the grievant would not have made any difference to the ultimate decision.

Here, the Company argues, nothing the Grievant could have said in his own defense would have changed the Company's decision. It points to Mr. Bailey's history of being combative, intimidating and uncooperative during disciplinary meetings, as well as his testimony at the hearing, urging that this demonstrates that he could not have helped his case if given the opportunity. It also mentions that the Grievant had opportunities to give input at stages in the grievance process prior to arbitration and failed to do so.

Finally, the Company contends that its decision to terminate the Grievant was not related in any way to Mr. Bailey's threat to take his holiday pay-related grievances "to a judge" in January 2011, and thus was not improper retaliation against protected activity. The Grievant's conduct in June 2011 stands on its own, the Company argues. Moreover, the fact that six months had passed since the January grievance issue negates the idea that there was any connection between the two matters.

Union Position

The Union first argues that the Grievant's discharge should be set aside because the Company did not conduct a fair and impartial investigation prior to making the decision to terminate. It cites a number of arbitral awards which have held that a full investigation includes the right for the grievant to be heard, and that failure to interview the grievant before deciding to terminate violates the "principle of industrial due process." *See, e,g,* Atlantic Richfield Co., 70 LA 707, 715 (Fox, 1978).

Here, the Union urges, Mr. Bailey was prejudiced when the Company refused to give him details of the reasons he was being suspended on June 9 or to allow him to present his side of the story before it decided to terminate him. Specifically, the Union argues that Mr. Bailey would have disputed Michael Moravek's description of their conversation on June 7. He also would have raised his contention that it was impossible for him to physically intimidate Jerome Howard during the June 8 meeting because, as he testified at the hearing, Skip Munn was standing in between himself and Mr. Howard during the entire meeting.

The Union also stresses that the Company's decision to interpret the Grievant's comments to Mr. Moravek as a death threat could have been impacted if Mr. Bailey had

9

been able to press the fact that he had told Mr. Moravek and others that he had no intention of going on the fishing trip. Thus, the Company's decision to terminate was based on a skewed version of facts as presented only by the accuser and not the accused, which is so inherently unfair as to require that the discharge be overturned.

Second, the Union maintains that there was not just cause for termination because the Company did not prove that the Grievant violated the Work Rules as charged in the notice of termination.

In this regard, the Company first argues that the Company did not prove that Mr. Bailey's conduct during the June 8, 2011 disciplinary meeting was intimidating or threatening. It maintains that Skip Munn could not testify to any specific words that the Grievant used that were intimidating. It points to Mr. Bailey's testimony regarding Mr. Munn standing between himself and Jerome Howard as having "totally destroyed" Mr. Munn's testimony that the Grievant "leaned into" Mr. Howard in an intimidating way.

The Union also urges that Mr. Howard has repeatedly stated that he was not, in fact, intimidated by the Grievant. The fact that Mr. Howard stayed after the meeting and spoke with the Grievant at length also demonstrates that Mr. Howard was not intimidated. Thus, it argues, there was no basis for discipline based on the Grievant's conduct during the June 8 meeting.

The Union next attacks the validity of the Company's charge of a "death threat" against Mr. Munn. It first takes issue with the allegation that Mr. Bailey ever said that Mr. Munn "would not come back." Instead, the Grievant maintains, he simply said that Mr. Munn might "get wet."

The Union also cites a number of prior awards where arbitrators have held that a grievant's comments were "just talk" and did not support a finding of a threat of harm absent some proof that the grievant intended to carry out the threat. *See, e.g.* Albion Manner Care Center, 116 LA 1386 (Sugarman 2002). Here, the Union stresses, there is no proof that Mr. Bailey intended to harm Mr. Munn. To the contrary, it points out, there is ample evidence to show that the Grievant had no intention to go on the Company fishing trip. Thus, the Grievant could not have carried through on the alleged threat.

The Grievant's comments to Mr. Moravek, the Union asserts, were nothing more than blowing off steam because he felt singled out about Mr. Munn's admonitions regarding when and where to take his breaks. They were spontaneous comments, not accompanied by physical gestures or other indications that he actually intended to do violence. It cites the case of Kiewit Power Constructors Co. v. NLRB, 652 F.3d 22 (D.C. Cir. 2011), in which a federal court upheld an NLRB finding that "single, brief, and spontaneous" comments, unaccompanied by other indicia of intent to actually commit violence, were insufficient to support termination.

Although it does not make a legal argument regarding retaliatory discharge for protected activities, the Union raises the issue of the Grievant's altercation with Brian Dick after

the January 2011 grievance meeting as evidence that Company management disliked or "had it out" for Mr. Bailey for reasons unrelated to those it articulated to support his termination.

The Union maintains that management singled out the Grievant for admonition and discipline in June 2011 based on its animosity towards him stemming from the holiday pay issue. When Mr. Bailey became frustrated about this treatment, it argues, the Company "seized on" innocuous comments and behavior, which it then "blew out of proportion" in order to contrive a reason to get rid of him.

The Union asks that the Grievant be reinstated and made whole.

## V. OPINION

Arbitrators in labor-management disputes typically consider several factors in making determinations under the just cause standard. Among them are adequate notice of the employer's standards, reliable evidence that the employee committed the violation(s), consistent application of discipline, and the appropriateness of the disciplinary response. It is also appropriate to consider whether the discipline at issue met "procedural" standards set forth in the CBA or commonly applied in similar circumstances.

Here, there is no dispute that the Grievant had adequate notice of the Company's Work Rules and of the Violence Policy. Nor is there any issue regarding disparate treatment with respect to the charges underlying the termination. This case centers primarily on the issues of whether the charges were proved, whether discharge was the appropriate response, and whether the Company conducted a fair and thorough investigation before it decided to discharge the Grievant.

Adequacy of the Investigation

The Company's investigation was adequate, despite the fact that Kim Donahue did not interview Mr. Bailey or consider his version of events before the decision to terminate was made.

Private employers are not held to the same standards for due process as public employers, which are required to provide an employee the opportunity to defend him or herself prior to being terminated. The undersigned does not agree with the arbitrators cited by the Union to the extent they have ruled that an employer must *always* consider the grievant's side of the story before deciding to terminate. There are certain instances where it seems very unlikely that an employee would have said or done anything to change the employer's mind, and this is one of them.

In the first instance, this is a case where the conduct at issue was witnessed by other employees. While the Union insists that Management was biased against Mr. Bailey

11

due to his threat to pursue his holiday pay-related grievances, it did not present any reasonable argument as to why Michael Moravek and Jerome Howard would give dishonest testimony against the Grievant.

Mr. Bailey's primary dispute of Mr. Moravek's testimony is that he simply did not say what Mr. Moravek reported. If the Company had been presented with this version of events, it would have been faced with weighing the Grievant's statement against Mr. Moravek's. It seems clear that the Company would have given greater weight to Mr. Moravek's version, because the witness did not have any motivation to lie, whereas the Grievant had every reason to deny the facts on which he could potentially lose his job.

Similarly, Jerome Howard told Ms. Donahue that Mr. Bailey had "leaned toward him," yelled and tried to intimidate him. Neither he nor Mr. Munn supported the Grievant's contention that Mr. Munn stood between him and Mr. Howard during the meeting so as to prevent the Grievant from "leaning in" towards Mr. Howard. Again, on this point the Company would have been faced with the competing versions, and it likely would have given greater weight to Mr. Howard, who again had no apparent reason to be misleading.

The CBA does not require a pre-termination interview of a discharged employee. Instead, it sets out a grievance process according to which, after discipline is issued, the Union can pursue a grievance and present its argument on behalf of the employee to the Company. If, after hearing the Union's presentation, the Company determines that the discipline was in error, the CBA requires that the discipline be set aside and the employee be made whole.

This procedure serves the same purpose as a pre-termination meeting – there is an opportunity for the employee's side of the story to be presented in a timely manner, prior to undertaking formal grievance procedures such as arbitration. Here, although the Company did not want to hold an initial grievance meeting with the Grievant in attendance on Company property, Mr. Bailey did not make any attempt to have input into that meeting, or any other stage of the grievance process prior to arbitration.

Finally, Mr. Bailey's conduct immediately prior to his suspension makes it seem very unlikely that he would have helped his own case if he had been given an interview. The Grievant was angry, he was abrasive, and he was blowing off steam to the point where Mr. Howard found him to be practically nonsensical. When advised that he was being suspended, he was again beligerant, demanding and, ultimately, menacing.

Thus, is unlikely that permitting the Grievant an interview during the investigation could have improved his position. The investigation was adequate.

Proof of the Charges – Conduct at June 8 Meeting

As stated above, the issue of the Grievant's conduct during the June 8, 2011 disciplinary meeting posits his version of events against the testimony of Skipp Munn

and Jerome Howard. The Company alleges that it was not only the words Mr. Bailey spoke to Mr. Howard – forbidding him to sign the warning notice – but it was his tone of voice (yelling) and his body language (leaning towards Mr. Howard) that demonstrated his attempt to intimidate.

Both Mr. Howard and Mr. Munn supported this version of events. The idea that the Grievant was angry and abrasive is also supported by Michael Moravek's description of Mr. Bailey's demeanor the night before this meeting. Neither Mr. Howard nor Mr. Munn supported the Grievant's claim that Mr. Munn was standing between him and Mr. Howard. However, even if that contention is true, both of these witnesses noticed the Grievant leaning into Mr. Howard in an angry and intimidating way nonetheless.

Thus, the allegation that the Grievant displayed intimidating conduct during the June 8 meeting is sustained. The fact that Mr. Howard did not *feel* intimidated is not controlling. The Violence Policy is concerned with the conduct of the employee *doing* the intimidating or threatening. The Grievant's conduct at the June 8 meeting violated the Company's Violence Policy, as it is written, because it was an "attempt to intimidate or harass," which is specifically prohibited in that policy.

## Proof of Charges – Alleged Death Threat

The charge that the Grievant made a death threat against Skip Munn is more challenging. The undersigned finds that Michael Moravek's testimony about what Mr. Bailey said – that Mr. Munn "would not come back" – is credible. However, the distinction between a viable threat to do physical harm and "shop talk"/blowing off steam is a fine one.

Although the evidence showed that Mr. Bailey said that, if he went on the fishing trip Mr. Munn "would not come back," it is also clear that the Grievant first advised that he was not going on the fishing trip. Mr. Bailey had also told other employees that he was not going on the fishing trip. Therefore, there is a question whether his comment to Mr. Moravek was a threat, or was simply hyperbole.

The record establishes that the Grievant was angry and animated about Mr. Munn's admonishments to him regarding where and when he could take breaks. This fact could cut either way. It could indicate that the Grievant was simply venting, out of frustration. On the other hand, it might suggest a festering anger that could turn into something more than talk if, for instance, the verbal admonishments were then followed up with a written disciplinary action.

The Union urges that it is unreasonable to think that the Grievant's comment to Mr. Moravek was anything more than idle talk, because it was not accompanied by menacing gestures or other indicia of likelihood to do physical harm. This contention is not entirely correct.

Mr. Bailey's comment, when analyzed in context, was accompanied by escalating anger, abrasiveness and lashing out at others — starting with the comment to Skip Munn about telling him "where to take a shit," moving on to making a comment that Michael Moravek interpreted as a threat, and culminating with his beligerant and intimidating conduct in the June 8 meeting. The Grievant even capped off this chain of events by making a final, menacing comment about the fishing trip to Mr. Munn as he was being escorted off the premises.

In a case such as this, an arbitrator is at a distinct disadvantage to evaluate whether the employee posed a viable threat. The arbitrator does not know the employee's background, and has not witnessed how he or she interacts in the workplace. There are certain "intangibles" about the employee that co-workers and the employer are in a better position to consider. The Company's argument regarding the severe implications of failing to address signs that an employee may become violent is well taken. When the evidence is this close, it may be prudent to defer to the estimation of the employer and other employees.

Here, fellow employees Moravek and Howard, as well as Company management, assessed the Grievant's intangibles as suggesting that he posed a serious threat. On these facts, the undersigned will not substitute her judgment for that of those who are in a better position to make that assessment.

Accordingly, the charge that the Grievant violated Group One Rule 17 by making a "death threat" against Liquids Engineer Skip Munn is sustained.

<u>Was Discharge the Appropriate Discipline?</u>

The Company has a "zero tolerance" stance regarding violations of its Violence Policy. Of course, the notion of just cause tempers "zero tolerance." Each case must be assessed on its own merits.

In this case, the decision to discharge was based on two separate charges of violation of the Company's Violence Policy, both of which are sustained as set forth above. As also set forth above, on these facts it is appropriate to defer to management's assessment regarding whether the Grievant was likely to escalate or remediate his abrasive and intimidating conduct, or whether he was likely to follow through on his threat.

The idea that Mr. Bailey's termination was in retaliation for protected activity was not supported by any evidence. The Company correctly points out that a significant period of time had passed between the incident in which the Grievant threatened to pursue his holiday pay grievances and the conduct in question. The Union did not rebut this argument. There was no compelling evidence or argument to support a claim of retaliatory discharge.

14

On these facts, it was not unreasonable for the Company to determine that the Grievant posed a risk to workplace security. As a result, the decision to terminate was appropriate.


**VI. AWARD**

The grievance is denied. The Company had just cause to terminate Bill Bailey.

*Kathryn Durham*

Kathryn Durham, JDPC

38508

Civil Action No. 2012-CV-1346-I (Rockdale)

Date Filed 3/12/12

Magistrate Court ☐
Superior Court ☑
State Court Rockdale ☐
Georgia, ~~GWINNETT~~ COUNTY

**Attorney's Address**
Drew Mosley, LLC
600 S. Perry St.
Lawrenceville, GA 30046

**Name and Address of Party to be Served**
Corporation Service Co.
40 Technology Pkwy, S. Ste. 300
Norcross, GA 30092

William H. Kaula
Plaintiff

VS.

Golden State Foods Corp.
Defendant

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL** ☐
I have this day served the defendant _____ personally with a copy of the within action and summons.

**NOTORIOUS** ☐
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place of abode in this County.

Delivered same into hands of _____ described as follows age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION** ☒
Served the defendant Golden State Foods, Corp. a corporation by leaving a copy of the within action and summons with Alsha Smith (agt) in charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL** ☐
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST** ☐
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

This 16 day of March, 2012

H. Scooba 726
DEPUTY

SHERIFF DOCKET _____ PAGE _____

GWINNETT COUNTY, GEORGIA

WHITE, Clerk     CANARY: Plaintiff Attorney     PINK: Defendant

SC-2 Rev.85